UNITED STATES, Appellee

v

JAMES CHOAT, JR., Sergeant, U. S. Marine Corps, and
GEORGE R. WEINER, Private First Class
U. S. Marine Corps, Appellants

7 USCMA 187, 21 CMR 313

Nos. 7555 and 7591

Decided June 29, 1956

*Matthew J. Faerber,* Esq., argued the cause for Appellants, Accused. With him on the brief were *Commander James A. Brough,* USN, and *Major Charles J. McCaffrey,* USMCR.

*Commander Guilbert W. Martin,* USN, argued the cause for Appellee, United States.

ROBERT E. QUINN, Chief Judge:

At a joint trial with Private First Class J. L. Fortune, the accused were convicted of an attempt to unlawfully enter a ship's store at U. S. Naval Air Station, Atsugi, Japan, with intent to commit larceny therein (Charge I and its specification), and conspiracy to commit larceny (Charge II). Each accused was sentenced to a bad-conduct discharge, confinement at hard labor for six months, reduction to the grade of private, and partial forfeiture of pay. After intermediate appellate authorities affirmed, we granted review to consider a number of questions raised by the record of trial.

While engaged in sentry duty at the Naval Air Station during the hours of 4:00 a.m. to 8:00 a.m. on Saturday, May 22, 1954, Sergeant J. P. Clinton met Fortune at the east gate. Fortune was also on guard. He asked Clinton if he would join him in an "attempt to rob" the ship's store. Before Clinton again went on watch at 8:00 p.m., he and Fortune were called into the guard room by the accused Choat, who was then the sergeant of the guard. There they talked about Fortune's previous proposal to Clinton. Choat and Fortune told Clinton that they would check the entrances and exits to the store that night. Choat also said that he would try to determine the route of the base civilian police. At that meeting, Clinton told the others that the "proposition" seemed sound and that he could use the money. However, after the meeting, Clinton attempted to communicate with a Special Investigator named Farrell, who was a friend of his. Not succeeding, he left a message that he wanted to see him. By 8:00 on Sunday morning, Clinton had still not spoken to Farrell, but he met Fortune and Weiner in the barracks. Weiner discussed the "possibility" of effecting an entrance to the ship's store through either the front or rear door. Fortune asked Clinton if he knew any person who stood a watch in the store. On receiving an affirmative reply, he asked Clinton to ascertain whether he could "get some cooperation" from this person.

Clinton told him that he would see what he could do. "Nothing definite" was decided upon. After the barracks discussion, Clinton finally communicated with Farrell and apprised him of the developments. Farrell asked him to go along with the plan.

On Monday morning at 4:00, Clinton again went on watch. Fortune also was on duty. He talked to Clinton and asked him if he could obtain a floor plan of the inside of the store. He also made some references to the need for two bags to carry away the loot. When Clinton was relieved of watch at 8:00 a.m., he had a conference with Investigators Farrell, Carson, and Kozman. He told them of the discussion about the bags and of the accused's interest in reaching someone on watch at the store. The investigators advised him to "let them believe there was a sailor" and that he could supply the bags and floor plan. During the remainder of the day, Clinton had "haphazard" encounters with each accused.

The record of trial does not clearly detail the events of Tuesday and Wednesday. At about 9 p.m. on Tuesday, Clinton left the base with Fortune and proceeded to Fortune's house, where he met the accused. The nature of the meeting is not described. Some time on Wednesday, Clinton received a floor plan of the ship's store from the special investigators, which he turned over to the accused within a half hour. The plan showed that entry could be effected by breaking through a thin plywood wall in a passageway leading to a bowling alley. In an effort to obtain a tape recording of a discussion on the plan, Clinton arranged for a meeting at his girl friend's house for Wednesday night. Fortune and Weiner, however, went on liberty and the meeting did not take place. On Thursday night, Clinton met Fortune and both accused at Fortune's house. At this meeting, the plan was further developed. Weiner proposed that they all leave Fortune's house by car and proceed to a specified opening in the fence around the Naval Base. From there they would proceed

**189**

by foot to the area by the ship's store; after observing two rounds of the base police, Weiner was to go to the door and break the lock, permitting entry to the bowling alley passageway. With Weiner remaining outside, Fortune, Choat, and Clinton were to enter the passageway. They would remove some lockers from the wall with a crowbar and then break through the plywood partition to the store. They were to take all the cameras and jewelry in the store. When they completed their mission, they were to return to the outer door. On Weiner's signal from the outside, they would leave, proceed to the car, and go on to a "friend's house."

About noon on Friday, Fortune requested special liberty for himself and Clinton, which was granted after the executive officer had consulted with the special agents. Fortune and Clinton went to Fortune's house. There they met Choat and a Japanese national. Weiner was not present; he was playing baseball. The plans of the previous night were "rehashed." In addition, Fortune told the Japanese that if he would lend him some money, the loot would be "unloaded" with him. Fortune wanted the money to buy some gear and to bribe the sailor who was supposed to be on watch at the store. Earlier, the accused had importuned Clinton for the sailor's name, and he had put them off. However, at the suggestion of Investigator Carson, he finally told them that the sailor wanted $100 for his part in the proposed venture. Fortune was unable to obtain the money from the Japanese. Nevertheless, he informed Clinton that he would purchase a crowbar at a local hardware store. He, Choat, and Clinton then returned to the base. On arrival, they went to see Weiner. He gave Clinton $55 to bribe the fictitious sailor. In turn, Clinton turned over the money to Agent Farrell.

Late Friday night, Clinton went again to Fortune's house. The accused were also present. They rehearsed "the whole thing" including several changes in the original plan. Instead of obtaining a car for the venture, they would be obliged to take a taxi to the base; and since the taxi would have to be dismissed, they decided that they would carry the articles taken from the ship's store. This meant also that they could not use the "friend's house." Fortune's house was also too far. Moreover, he was unwilling to use it because he was suspected of a previous offense, and he considered it "too hot." As a result, it was agreed to take the loot to Clinton's girl's house, which was located about three-quarters of a mile to a mile away. Choat suggested taking a .22 rifle, but the suggestion was disapproved because it was believed that if weapons were necessary they could be obtained in the store.

Weiner obtained a taxi and the group proceeded to the base. They wore sneakers and gloves or socks used as gloves. Fortune carried a crowbar wrapped in a towel. Arriving at the fence of the base, they dismissed the taxi. They went through the barbed wire fence and proceeded to the ship's store area. They split into two groups. Clinton and Choat were in one; Fortune and Weiner were in the other. The latter turned toward the chapel. It was then about 1:00 a.m. Clinton noticed the others approaching. Choat entered the chapel where he was apprehended by officers who were lying in wait. The others stayed in the doorway of the chapel. Suddenly, they heard the sounds of a scuffle from the inside but did not enter. Fortune, Weiner, and Clinton then went across the street to a baseball diamond. They lay down behind the backstop observing the store and discussing Choat's disappearance. Weiner told Clinton to time the police patrol. A few minutes after the patrol's second round, they noticed flashes of light in the chapel. Fortune got up and ran away. Weiner followed. Clinton passed both. In his flight, Fortune threw away the crowbar. Clinton picked it up and using it as a gun, ordered Weiner and Fortune to halt or he would shoot. They stopped. Agent Carson and Captain Brown appeared on the scene and Fortune and Weiner were taken into custody.

We direct our attention first to the accused's contention that the specifica-

tion of Charge II does not constitute an offense. In pertinent part the specification alleges that the accused and Fortune conspired to commit larceny and that "in order to effect the object of the conspiracy . . . Fortune did procure a crowbar with which to break and enter the Ship's Store." The accused maintain that the alleged overt act was no more than preparation and is not directed "towards the commission of the offense."

Conspiracy is punishable under Article 81 of the Uniform Code of Military Justice, 50 USC § 675, "if ▆▆▆▆▆▆▆ one or more of the conspirators does an act to effect the object of the conspiracy." The overt act need not itself be a crime; on the contrary, it can be an entirely innocent act. Braverman v United States, 317 US 49, 63 S Ct 99, 87 L ed 23. Consequently, there is no requirement that it pass beyond the stage of preparation so as to amount to an attempt to commit the substantive offense. See Farnsworth v Zerbst, 98 F 2d 541 (CA 5th Cir) (1938); Luxenberg v United States, 45 F 2d 497 (CA 4th Cir) (1930); cert den 283 US 820, 51 S Ct 345, 75 L ed 1436. All that is required is that the overt act be a "manifestation that the conspiracy is at work." United States v Offutt, 127 F 2d 336, 340 (CA DC Cir) (1942); Manual for Courts-Martial, United States, 1951, paragraph 160. The distinction is succinctly stated in Reg. v Taylor, 1 Fost & F. 512 cited in People v Youngs, 122 Mich 292, 81 NW 114, 115, as follows:

". . . . 'The act, to constitute a criminal attempt, must be one immediately and directly tending to the execution of the principal crime, and committed by the prisoner under such circumstances that he has the power of carrying his intention into execution. If two persons were to agree to commit a felony, and one of them were, in execution of his share in the transaction, to purchase an instrument to be used in the course of the felonious act, that would be a sufficient overt act in an indictment for conspiracy, but not in an indictment of this nature.' "

The evidence may show that an innocent act has no relation to the conspiracy charged. See Fain v United States, 209 Fed 525 (CA 8th Cir) (1913). However, from the standpoint of pleading, a specification is ordinarily immune from attack if it alleges that the overt act was done to effect the object or the purpose of the conspiracy. Heskett v United States, 58 F 2d 897 (CA 9th Cir) (1932), cert den 287 US 643, 53 S Ct 89, 77 L ed 556. In any event, it is clear that a court-martial could find as a matter of fact that the procurement of a crowbar was a "manifestation" of the conspiracy alleged.

Our second problem is to determine whether the evidence is sufficient to support the findings of ▆▆▆▆▆▆ guilty of the specification of Charge I. The crucial part of this issue is whether the overt acts of the accused transcend preparation and amount to an attempt. In other words, did the accused's conduct constitute a "direct movement towards the commission of the crime." Gregg v United States, 113 F 2d 687, 690 (CA 8th Cir) (1940), reversed on other grounds, 116 F 2d 609; Manual for Courts-Martial, United States, 1951, paragraph 159. The line of demarcation between preparation and a direct movement toward the offense is not always clear. Primarily, the difference is one of fact, not of law. United States v Coplon, 185 F 2d 629, 633 (CA 2d Cir) (1950); cert den 342 US 920, 72 S Ct 362, 96 L ed 688.

Here, the accused met at Fortune's house. Together they proceeded to the base. After surreptitiously entering, they went to the immediate area of the ship's store. They wore sneakers and gloves and were armed with implements to effect an entry. Under the circumstances, we think that the court members could find that the accused went beyond preparation, and that they did not commit the offense charged only because of the intervention of the law enforcement officers. People v Stites, 75 Cal 570, 17 Pac 693; People v Sullivan, 173 NY 122, 65 NE 989. In the latter case, the accused also proceeded in a group to a street, on which was located a post office, which they planned to

**191**

break into. When they were still on the opposite side of the street, a police officer interrupted them. The encounter resulted in the policeman's death. Discussing whether the defendants had proceeded to the point where they could be regarded as engaged in an attempt to enter the post office, Judge Cullen of the New York Court of Appeals said (page 135):

".  .  . I do not assert that in the present case merely procuring the tools with which to commit the burglary constituted an attempt to commit it, and it may be that merely starting on the road towards the building was also insufficient to constitute an attempt. But when the defendants reached the building a different question is presented. The going to the building with the purpose of breaking into it, having procured in furtherance of that design the necessary implements, seems to me to be a sufficient overt act. It may be asked at what point of their proceedings did the acts of the defendants constitute an attempt. It is difficult, if not impossible, to lay down any general rule by which it can be determined whether acts are too remote to constitute an attempt to commit the offense. While the defendants were at a distance from the building they might have changed their minds and abandoned the design. But if the jury believed that the defendant and his associates were at the post office reconnoitering or inspecting it with the intent to break it open, and that they would have done so had their design not been frustrated by the presence or interference of the deceased, the police officer, then I think it could properly find that they were engaged in an attempt to commit burglary.  .  .  ."

For the next assignment of error the accused contend that the activities of the law enforcement authorities amounted to entrapment. See Sorrells v United States, 287 US 435, 53 S Ct 210, 77 L ed 413. In support of their claim, they have catalogued the investigators' contributions to the accused's plan, with special emphasis on their preparation and delivery of a floor plan of the store. These circumstances perhaps merit a reiteration of the admonition expressed by the author judge in his concurring opinion in United States v Tamas, 6 USCMA 502, 512, 20 CMR 218, but they do not establish entrapment. According to Clinton's testimony, before he had even spoken to Investigator Farrell, Fortune had invited him to join in the venture; Choat had spoken to him and Fortune about the matter and had indicated that he would check the entrances and exits to the store and ascertain the route of the base civilian police; and Weiner had discussed the "possibility" of effecting entry by either the front or rear door. This evidence is sufficient to support a finding that the plan to break into the store and steal the cameras and jewelry not only originated with the accused, but had made fair progress before the law enforcement agents had come on the scene. United States v Buck, 3 USCMA 341, 12 CMR 97. Consequently, we find no substance in the asserted claim of entrapment.

The final error for our consideration relates to the law officer's instructions with regard to Charge I. Instructing on the elements of that offense, the law officer said, in part, that the court members must find that "at the time and place alleged, the accused did an overt act." He also emphasized that the act must have "amounted to more than mere preparation and apparently tended to effect the commission of the intended offense." Although defense counsel objected to the lack of particularization, the law officer did not mention any specific overt act.

In this instance we are not dealing with a particular act set out in the specification. Rather we are concerned with the total evidence. If the evidence shows that the accused went beyond preparation, the offense is established. Apart from a motion for a finding of not guilty, it is not incumbent upon the law officer to determine what particular act or acts tend to establish an attempt. That is a matter for the determination of the court-martial. See People v Sullivan, supra. As we said in United

States v Harris, 6 USCMA 736, 744, 21 CMR 58: ". . . the emphasizing of particular facts by special instructions will often mislead a jury as to their relative importance, and that should be avoided." See also United States v Coplon, supra.

The decision of the board of review is affirmed.

Judges LATIMER and FERGUSON concur.