UNITED STATES, Appellee

v

JOSEPH H. JOHNSON, Sergeant, U. S. Army, Appellant

7 USCMA 488, 22 CMR 278

No. 7503

Decided January 11, 1957

*First Lieutenant Norman W. Polovoy* argued the cause for Appellant, Accused. With him on the brief was *Captain Frank C. Stetson.*

*Captain Vernon M. Culpepper* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton* and *First Lieutenant James G. Duffy.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

A general court-martial convicted the accused of desertion (Charge I) and disregard of a general order (Charge II), in violation of Articles 85 and 92, Uniform Code of Military Justice, 10 USC §§ 885, 892, respectively, and sentenced him to a dishonorable discharge, total forfeitures, and confinement at hard labor for two years. The convening authority approved the findings of guilty and the sentence, and a divided board of review affirmed his action. We granted review to determine whether the evidence is sufficient to support the desertion charge.

The accused was a section leader in the recoilless platoon of Dog Company, 16th Infantry, which was stationed in Schweinfurt, Germany. He had been in service for nearly six years. For almost a year he served in combat in Korea and had been awarded the Silver Star for gallantry in action. In January or February 1955, however, the Company Commander promoted to sergeant first class a sergeant who was junior to the accused. The accused discussed the matter with the Company Commander. At first he requested a transfer because "it didn't appear that he would ever get ahead in the job

490

that he was in." As a result of the discussion, however, "an understanding" was reached, and the accused withdrew his request for transfer. He left the interview with a "better attitude" than he had had at the start. His platoon leader, First Lieutenant H. Colbert, testified at the trial that up until the time of the incident which resulted in the charges, the accused had been doing an "excellent job of soldiering." Other members of the accused's company gave similar testimony.

On Friday evening, April 1, 1955, the accused acted as battalion charge of quarters. Normally the charge of quarters has off the next morning. The accused was relieved from duty in regular course at 7:30 on Saturday morning. According to a pretrial statement by him, it appears that shortly thereafter he left the company area by way of the pass gate. The Company Commander testified that the accused had a "special privileged NCO pass, 16th Infantry NCO pass" which had a geographical limit of fifty miles from the station. After visiting two gasthauses and drinking several bottles of beer, the accused returned to the company area. He borrowed $30.00 and then returned to town. At about 1:00 p.m. he hired a taxi driven by Herr Koebbel. Here the chronology of events breaks down. At about 3:00 p.m. the accused was joined in the taxi by Private First Class J. B. Williams. Williams had a drink from a bottle of cognac purchased by the accused. Approximately an hour later, Williams left. In his opinion, the accused was "just about drunk."

When Williams left, the accused directed Herr Koebbel to drive to Hesselbach. On reaching that town, he ordered Koebbel to "Drive further on." They continued to Ballingshausen. Again the accused ordered Koebbel to "go on." They drove to Merkershausen. Once more the accused wanted to go on, but Herr Koebbel refused to go further because the accused "didn't state a town or . . . where he wanted to go." Koebbel thought that the accused was "not quite sober." The accused left the taxi. It was then about 5:00 p.m. Koebbel tried to get the accused to return to Schweinfurt

with him, but the accused shrugged him off. He accosted the drivers of other vehicles and asked them to take him to Koenigshofen. One of the persons thus stopped was A. Heppt. Herr Heppt believed that the accused was "drunk," but that he knew what he wanted.

Eventually the accused turned up in Koenigshofen. A local civilian policeman, Werner Mueller, had been notified that the accused was apparently headed for the East zone. When he saw the accused attempting to obtain a taxi, he cautioned the driver against picking up the accused. Riding his bicycle, Mueller more or less followed the accused as he proceeded on foot from Koenigshofen to Eyershausen. In Mueller's opinion, the accused walked "easily" but appeared to him to be a "drunkard."

At the entrance to Eyershausen the accused was accosted by Guenther Goerlich and Ruhl, members of the civilian border police. It is appropriate to note here that Eyershausen is three kilometers from the border, but within fifty miles of the accused's station. A Headquarters V Corps order, which provides the basis for Charge II, prohibits an approach to the border nearer than five kilometers, except under special conditions. The border police asked the accused where he wanted to go, and he replied "I am going to my girl." They told the accused to get into their car, and they would take him where he wanted to go until the military police arrived. Apparently they went to a gasthaus. There the accused informed them that his division was soon to be returned to the United States where he would be treated "like a dog." He also told them that if they had not been there, he would have gone across the border. Just then the military police arrived. Corporal Hickey, a military policeman, advised the accused that he was under arrest for attempted desertion. He also informed the accused of his rights under Article 31. Corporal Hickey testified that the accused was intoxicated, but not drunk; his actions were slow, but his speech was coherent. The accused was asked why he had gone to Eyershausen. He replied that he was

"trying to go to the East Zone." While returning to Schweinfurt in the military police vehicle, he asked Corporal Hickey whether he would be given a general court-martial for "trying to go to the East Zone."

To sustain the charge of desertion against the accused, the evidence must show beyond a reasonable doubt that he went or remained absent without proper authority from his "unit, organization, or place of duty with intent to remain away therefrom permanently." Article 85(a)(1), Uniform Code of Military Justice, 10 USC § 885. The evidence as to the accused's absence status is unclear. Part of this deficiency is due to an apparent assumption on the part of trial personnel that the court members were thoroughly familiar with the terms of a noncommissioned officer's pass and that, therefore, no particularization was needed. Under certain circumstances, an appellate court will recognize that matters of common knowledge to military personnel at the scene were considered by the court-martial. United States v Weiman, 3 USCMA 216, 218, 11 CMR 216. Whether the present situation would ordinarily justify such appellate recognition need not be decided. The trial proceeded upon the assumption that the accused possessed a lawful pass. We are satisfied to accept that assumption in deciding the case. See United States v Cambridge, 3 USCMA 377, 12 CMR 133.

The pass in question was described simply as a "special privileged . . . 16th Infantry NCO pass." The only evidence of its terms and provisions was that it was limited to a geographical area of fifty miles from the accused's station. Army regulations provide that passes are generally valid from "recall to reveille the next following duty day." AR 630–20, paragraph 2. Whether the pass authorized only an overnight absence or whether it extended to Sunday as a nonduty day does not appear. This important fact should have been made a matter of record. Our view of the case, however, makes it unnecessary to determine the precise time limits of the pass. It is sufficient to note that at the time the accused was finally taken into custody by the military police he was still within the geographic and apparent time limits of his pass. Consequently, unless the accused's pass was somehow voided by his actions, he was not absent without authority, and he cannot be convicted of desertion.

At the trial the law officer instructed the court members as follows:

". . . if you are not convinced beyond a reasonable doubt by legal and competent evidence that the accused's absence was unauthorized but you are satisfied by legal and competent evidence beyond a reasonable doubt that the accused having once been absent with authority and with a pass exceeded the limits of his pass, you may then nevertheless consider the question. of whether the accused was absent without leave. Thus, subject to the above instructions, if you are further satisfied by legal and competent evidence beyond a reasonable doubt, that the accused did violate the limits of his pass and that this violation was so palpable as to constitute a complete abandonment of authority granted to him by this pass, you may then consider this question on the elements of absence without leave in the question of desertion and also on the lesser included offense of absence without leave."

This instruction seems to be founded on a provision in the Manual for Courts-Martial, United States, 1951. Paragraph 164a provides that:

". . . a member of the armed forces absent on a short pass or liberty from his organization who is found on board a ship at sea, without authority, bound for a distant port, may be regarded as having abandoned any authority he might have for his absence and to be absent without proper authority, although he may not have gone beyond the area fixed in the pass and the pass may not have expired."

The crucial inquiry, therefore, is whether there can legally be an abandonment of a pass so as to transform an authorized absence into an unauthorized one.

492

A pass has been referred to as a privilege and not an absolute right. AR 630–20, June 24, 1955, paragraph 1. From this premise, it is contended that the privilege, like other privileges, such as that against self-incrimination, can be waived or abandoned. The attempted analogy, however, disregards the basic distinction between administrative determinations and criminal law enforcement. Administrative considerations cannot themselves satisfy the requirements for enforcement of the military criminal law. See United States v Wise, 6 USCMA 472, 20 CMR 188. To subject a person to the sanctions of the Uniform Code, it must be shown that his conduct actually violates its provisions.

A pass authorizes a person to remain away from his place of duty or from his organization. AR 630–20, paragraph 2. We may assume that the authority who granted the pass can revoke or recall it at will. But what actual power does the possessor have over his pass? As far as we can determine, he has none. He cannot change it in any way. In short, his status as a person on pass is as personally unalterable as that of any military assignment given to him. If he is ordered to perform a particular duty at a particular place, he cannot by his own act abandon the assigned place and the assigned duty. It would seem to follow that he also lacks the power to affect his military status, when officially he has no duty and no assigned place. It is a mistake, therefore, to say that because a pass is labeled a "privilege" it can be abandoned by the possessor. As a matter of fact, service in the military, especially during a period of grave emergency, is not only a duty, but a high privilege. Yet, such service cannot be casually terminated. We have long held that even the expiration of the term of enlistment does not confer upon a person the right to cast aside his military duty on his own initiative. United States v Downs, 3 USCMA 90, 11 CMR 90. We conclude that a pass cannot be "abandoned" so as to convert an authorized absence into an unauthorized one, within the meaning of Article 85 of the Uniform Code. Consequently,

the evidence does not support the conviction of desertion.

Left for consideration is whether the evidence can support a finding of guilty of the lesser offense of attempted desertion. Under Article 80, Uniform Code, 10 USC § 880, an act done with a specific intention to commit an offense which amounts to more than "mere preparation and tending, even though failing, to effect its commission, is an attempt to commit that offense." The act need not be the ultimate step in ▮▮▮▮▮▮ ▮ the consummation of the crime. Instead, it is sufficient if the act is one which, in the ordinary and likely course of events, would, if not interrupted by extraneous causes, result in the commission of the offense itself. State v Schwarzbach, 84 NJL 268, 86 A 423; People v Gibson, 94 Cal App2d 468, 210 P2d 747.

The overt act must be viewed in the light of the character of the interruption and the nearness of ▮▮▮▮▮▮ ▮ the consummation of the offense intended. People v Volpe, 122 NYS2d 342 (Co Ct). Of course, when interrupted, the accused was not yet in an unauthorized leave status. However, to be guilty of an attempt, the accused did not have to be actually absent without leave. Had he been so absent, the evidence would be sufficient to sustain a finding of guilty of the offense of desertion. The next step short of an unauthorized absence was to place himself in such a position that, if uninterrupted, the natural progression of events would bring about an unauthorized absence. To hold otherwise would make it impossible for anyone to commit the offense of attempted desertion, notwithstanding that Congress clearly contemplated the existence of such an offense. See Article 85(c). Consideration must also be given then to the nature of the intended offense. People v Weleck, 10 NJ 355, 91 A2d 751.

The accused's expressed dissatisfaction with his prospective return to the United States, his entrance into a forbidden zone, his declared intention of going to a territory under foreign control, his physical nearness to that destination, and, finally, the short time of

authorized absence could provide the basis for a reasonable inference that, except for his detention by the civilian border police, the accused would have entered the East zone intending to remain away permanently and would not have returned to his organization within the time prescribed by his pass. Thus, the course of events shows a probability that the offense charged might have been committed, but for outside interference. As the Supreme Court of Connecticut remarked in State v Mazzadra, 141 Conn 731, 109 A2d 873, 875, it is sufficient if the acts constitute "at least the start of a line of conduct which would lead naturally to the commission of a crime which appears to the actor at least to be possible of commission by the means adopted." Hence, notwithstanding that the accused still had a *locus penitentia* when interrupted, United States v Coplon, 185 F2d 629, 633 (CA2d Cir) (1950), a court-martial could find that he had passed beyond the stage of preparation and reached a point which in the normal course of events would result in the commission of the offense charged. The evidence could thus support a finding of guilty of attempted desertion.

Reasonable persons, however, may differ over the "proximity and nearness of the approach" of the overt acts to a consummated offense. People v Rizzo, 246 NY 334, 337, 158 NE 888; United States v Choat, 7 USCMA 187, 21 CMR 313. Here the court-martial was instructed on attempted desertion. But, in light of the erroneous instructions it received in regard to the abandonment of a pass, we believe that it did not consider this question adequately. In our opinion, the accused is entitled to have the question decided by the court-martial free from the influence of incorrect rules of law. State v Mazzadra, supra.

We turn to the disposition of the case. First, we set aside the findings of guilty of desertion and the sentence. When setting aside one of several findings of guilty and the sentence, we have on occasion returned the record of trial to The Judge Advocate General for submission to a board of review for further action consistent with our opinion. Under that form of direction, the board of review could in its discretion either dismiss the entire charge which we set aside and reassess the sentence on the basis of the approved charge, or order a rehearing as to the lesser offense supported by the evidence and a redetermination of the sentence by the court-martial. United States v Berry, 6 USCMA 609, 20 CMR 325; United States v Field, 5 USCMA 379, 18 CMR 3. We have, however, emphasized that in certain instances the interests of justice require a redetermination of the sentence by the court-martial. United States v Voorhees, 4 USCMA 509, 16 CMR 83. Although a violation of a general order is a comparatively serious offense, we think it was so overshadowed by the desertion charge that there is a fair risk the original sentence was adjudged because of the latter. Consequently, we return the case to the initial reviewing authority. In his discretion he may dismiss the charge of desertion and its lesser included offense of attempted desertion and order a rehearing on the sentence on the basis of Charge II, or order a rehearing on attempted desertion and a redetermination of the entire sentence by the court-martial. United States v Field, supra.

Judge FERGUSON concurs.

LATIMER, Judge (dissenting):

I dissent.

Accused was assigned to duty in Schweinfurt, Germany, and because of his rank as a noncommissioned officer, possessed a pass valid for a distance of fifty miles from his station. On April 2, 1955, he violated a General Order of the V Corps, which prohibited American servicemen, except under certain circumstances, from entering a zone whose western border was five kilometers from East Germany. While the prohibited area at the place of his entry, and his point of furtherest penetration, were within the permissible radius of his pass, there seems to be no dispute about the fact that he had full knowledge of the order, the boundaries of the zone, and that his pass did not authorize his presence at the place where he was taken into custody.

On the day in question, the accused, after visiting several taverns, hired a taxicab and instructed the driver to proceed to the town of Hasselbach, which is in the direction of the East German border. Upon arrival there, he directed the driver to continue on toward the east. The driver became apprehensive as he approached the out-of-bounds zone and refused to drive beyond the town of Merkershausen. From that place the accused travelled on foot to the town of Eyershausen, which placed him approximately three kilometers within the prohibited danger strip. There he was detained by the West German border police and later turned over to United States military police.

As the accused pursued his journey by hiking east from Merkershausen, he hailed a number of persons driving cars toward East Germany, but, for obvious reasons, no one was interested in offering him a ride. His attempts to get transportation, together with his other activities, bespeak an aggressive desire to get into Soviet-controlled territory. Witnesses who observed and spoke to him during the interval of time surrounding this incident testified that he was intoxicated, but that "he apparently knew what he was doing." The record speaks quite clearly, by oral and medical testimony, that he was under the influence of the liquor he had consumed, but the court-martial found, under appropriate instructions, that his condition did not prevent him from forming the specific intent not to return.

In addition to his physical movements toward the border, some of the evidentiary items which support that finding are these: While he was being detained by the German border police, he made certain statements regarding his desire to get into the Communist sector. As part of his conversation, and apparently as an excuse for his desire to reach that area, he remarked that his division was returning to the United States, and in the United States he would be treated "like a dog, not like a man." Finally, he made other oral admissions to the military police who apprehended him, wherein he expressed his desire to enter the East German Zone.

Militating against the finding of an intent to remain away permanently is testimony to the effect that he had informed the taxicab driver to meet him the following day at the Kaserne in Schweinfurt, and when asked by a German police official where he was going, he replied "to see his girl who was in Hassfort." That town is situated in West Germany. Furthermore, the record reflects that accused was a regular army sergeant with approximately five years' service. He had participated in five campaigns in Korea and had been awarded several decorations for his service. Included in these citations was one for gallantry in combat, for which he received the Silver Star. During one offensive, he was severely wounded and his subsequent military service, up to the time of this incident, was rated as excellent. Perhaps his turning to alcohol could be traced to the fact that immediately prior to this drinking episode he had received information that his wife was contemplating a divorce. The pages of a cold record do not always picture the true situation, and the facts just related cause me to wonder if they really portray an American soldier bent on deserting his service to join those against whom he had so gallantly fought, but the choice is not mine to make when the evidence amply supports the findings, as it does here.

The controlling issue in this case is the sufficiency of the evidence to establish the element of absence without authority, and I agree with the majority that that element was not established. However, if I understand my associates correctly, they hold that a soldier can never abandon the authorization of his leave or pass, and thus become absent without leave. It is their adherence to that concept which causes me first to part company.

The term "abandonment of authority" is not new to military law, and the Manual for Courts-Martial, United States, 1951, paragraph 164a, page 313, speaks of it in connection with absence without leave, saying:

". . . When, without being regularly separated, a member of an armed force enlists or accepts an appointment in the same or another armed force without fully disclosing the fact that he has not been so regularly separated, or attempts either such act while in a duty status or while on pass, liberty, or leave, he by that act abandons his status of duty, pass, liberty, or leave, and from that moment becomes absent without leave with respect to the former enlistment or appointment. Similarly, a member of the armed forces absent on a short pass or liberty from his organization who is found on board a ship at sea, without authority, bound for a distant port, may be regarded as having abandoned any authority he might have for his absence and to be absent without proper authority, although he may not have gone beyond the area fixed in the pass and the pass may not have expired."

The Manual paragraph merely gives an illustration of what its authors considered to be an abandonment of authority, but it does not express the concept which supports the exemplification. In an attempt to ascertain the true reason for the rule, I have sought out other military authorities. In Volume 3, Army JAG Bulletin, page 419, I found the following expression:

"An enlisted man had standing permission to leave his post on Sunday and go anywhere within a radius of 50 miles return Monday afternoon at 1500. On one occasion he went several hundred miles from the post, and on the way back he was stopped by military police. However, they allowed him to proceed and he returned to his station within the time limits of his permission. It was not shown whether he was stopped inside or outside the limits of his permission. Held: The enlisted man's physical presence at a place far beyond the authority of his pass might evidence an abandonment of the authority granted him for his absence from his post and subject him to a charge of violation of A. W. 61 (MCM, 1928, par. 130a, p. 143). Where the violation of the limits of the pass is not of

such a palpable nature as to show a complete abandonment of the authority granted thereunder, a charge may appropriately be preferred against the accused under A. W. 96 for the wrongful violation of the terms of his pass, rather than for absence without leave. Thus, if the accused were apprehended within the area and within the time limit of his pass on his way back to his station, proof that he had intentionally gone a relatively short distance beyond the limits of his pass would establish a willful violation of the terms of his pass rather than an absence from his command, guard, quarters, station or camp, without competent authority. *SPJGJ 1944/12521, 25 October 1944.*"

While the next opinion grew out of a dispute over the question of whether an injury was incurred in line of duty, it states a rule similar to the one expressed above. In Volume 9, Army JAG Bulletin, page 114, is this statement:

". . . Held: Current Department of the Army policy, regarding the effect of territorial violations of authority to be absent in line of duty determinations (contained in AGPO–CR 210.711, subject, 'Passes & Leaves of Absence,' dated 6 March 1950) is as follows:

'. . . for determination of line of duty status the exceeding of geographical limitations placed on class A passes, other passes and leaves of absence [should] be regarded as violation of orders under Article of War 96 and not as absence without leave under Article of War 61 unless circumstances in the case other than exceeding of geographical limits indicate absence without leave.'

"It is clear that a soldier having been given official permission to leave his station on pass is not during such time in an 'absent without leave' status (see Dig. Op. JAG 1912, p. 687), unless the violation is of such a nature as to show a complete abandonment of the authority granted by the pass (MCM, 1949, par. 146a). He may, however, be guilty of violating

the *terms* of his pass and thus be chargeable under A. W. 96 (See SPJGJ 1944/ 12521, 25 Oct. 1944, 3 Bull. JAG 420)."

In United States v Edwards, 18 CMR 830, an Air Force board of review was confronted with a situation where an enlisted man who had authority to travel 250 miles from his station was detained by sickness at a place 350 miles away. The special court-martial was instructed by the president that if the accused went beyond the territorial limits of his pass he was absent without leave as a matter of law. In condemning the instruction the board of review stated:

"Obviously, the language of the Uniform Code of Military Justice does not support the conclusion that one who exceeds the territorial limits of his pass is ipso facto absent without leave. To constitute the offense of unauthorized absence a member of the armed forces must absent himself, or remain absent, through his own fault, from the place where he is required to be at a prescribed time (see MCM, 1951, par 165, at p. 315). Clearly, since the accused was granted permission to be away from any and all places of military duty over the weekend by his duty sergeant, and under the authority of his Class 'A' pass, there was no place of duty at which he was required to be during this interval. An essential element of the offense of unauthorized absence during this period was lacking. Consequently, the above-quoted instruction of the president of the court was error as a matter of law."

From all of the foregoing authorities I draw the conclusion that an accused may abandon the authority granted to him to be absent from his place of duty, and thereby become absent without leave, and that the measuring rod for determining whether there has been an abandonment of the pass is the nature and seriousness of the violation. I am willing to accept this as a sound, fair, and workable rule permitted by the Code —and apply it.

In the examples given, any abandonment seems to have been based upon the supposition that, under the circumstances shown, it was highly improbable that the accused could be at his place of duty when his work had to be resumed, or that he would have been reasonably available for duty if an emergency had arisen. It is worth noting that in most instances when military personnel are granted regular week-end passes, there is a territorial limit prescribed by the headquarters granting the privilege. I am sure there is a reason for that limitation, and presumably it would be to restrict the members of the command within an area where they could be assembled without undue delay. It would appear to me that if such is the case, the gravity of the pass violation used as a basis for determining abandonment must be determined according to its interference with military duty. Stated as I apply the rule, if the violation is such that it renders it impossible for an accused to be considered an effective member of the command, then he has forfeited his right to claim his preferred status of authorized absence, and there is in fact, and in law, an abandonment. On the other hand, if the violation is of a nature which in no way renders it improbable that an accused can safely return to his station within the time fairly contemplated by the pass, he retains his effectiveness for military purposes. The illustration used in the Manual, when measured by this rule, shows an accused who is an ineffective member of his unit, because he is on the high seas headed for a faraway destination, and it is not likely that he could return within the terms of his authorization. I can portray the other limit of the rule by suggesting a situation where an accused within the area of his pass steps in a place of business declared off-limits by a post commander. He does not by that act make it impossible to carry out his assigned duties when they must be resumed. Of course, to truly abandon the authority of the pass, his violation must be voluntary.

When the rule is applied to this case, I do not believe the accused had reached the point where he can be charged with abandonment. Obviously, his conduct placed him in an area where he had no right to be. The purpose for the re-

striction was well known, and from a political, and perhaps international, standpoint, his act of approaching the border was serious. But for that delict, the accused could be, and was, punished for a violation of a general order. Conviction of that offense alone will support the sentence meted out in this instance, so the Government is not left without an effective method of dealing with this type of offense. Conceding the potentiality for harm from the standpoint of precipitating an international incident, the accused's acts had not placed him in a position where he could not voluntarily return and be available for duty at the expiration of the period he was authorized to be away from his station. Territorially he had not exceeded his privilege, he was still in the American patrolled area, and he was subject to the control of friendly units. While he was approaching the point of no return, he had not reached it, and he had not placed himself in a position from which he could not return in good time, if he elected to do so. While his plan may have contemplated the abandonment of the terms of his pass, I am sure that he was saved from the ignominy of desertion by the officials who, in the exercise of good judgment, interrupted his journey eastward. In this connection, I mention that the law officer permitted the court-martial members to consider the question of abandonment based on the nature and seriousness of accused's act, but he left them free to consider the issue without limitation. Hence, I am convinced that the seriousness of his conduct was considered solely from the viewpoint of accused's proximity to the East German border. A finding based on that theory cannot be sustained.

While, for the reasons indicated, I believe the evidence to be insufficient as a matter of law to support the finding of desertion, a different problem presents itself on the lesser offense of attempt to desert. Article 80(a) of the Code, 10 USC § 880, provides:

"An act, done with specific intent to commit an offense under this chapter, amounting to more than mere preparation and tending, even though failing, to effect its com-

mission, is an attempt to commit that offense."

Paragraph 164b, page 315 of the Manual, gives attention to this specific offense, saying:

"An attempt to desert is an overt act beyond mere preparation toward accomplishing a purpose to desert. Once the attempt is made the fact that the person desists, either of his own accord or otherwise, does not cancel the offense. The offense of attempting to desert is complete, for example, if the person, intending to desert, hides himself in an empty freight car on a military reservation, intending to effect his escape by being taken away in the car. Entering the car with the intent to desert is the overt act."

The law officer anticipated that this offense might be in issue, for he gave the following instruction:

". . . Also included within the offense of desertion is the lesser included offense of attempted desertion. The elements of that offense are as follows: That at the time and place alleged, the accused did a certain overt act; Second, that the act was done by the accused with intent to absent himself from his organization without proper authority and to remain away therefrom permanently; Third, that the act amounted to more than mere preparation and apparently, tended to effect the commission of the intended offense, that is, that the act apparently would have resulted in the actual commission of the intended offense except for the interference of some cause preventing the carrying out of the intent."

I conclude the evidence amply supports a finding of guilt on this offense. Insofar as the overt act is concerned, the accused conducted himself in a manner which far exceeded mere preparation to absent himself without leave. He had a fixed purpose to journey to the East German zone, and the acts done by him reasonably tended to bring about that result. Had he reached that area, he certainly would have abandoned the

498

authority of his pass. A number of persons tried to discourage him from entering the danger zone, and yet he continued to walk on uninfluenced by their warnings. It was only the effective interruption of his journey by the border guards which prevented the principal offense of desertion from being committed. United States v Choat, 7 USCMA 187, 21 CMR 313.

It is to be noted from the definition of the crime set out in Article 80(a) that, in order to commit this offense, the overt acts of the accused must have been performed with the specific intent to remain away permanently. While I have some personal reservations concerning the true intent of this accused because of his intoxication and his record, I recognize that this issue was placed before the court in its proper perspective and that they found the existence of the requisite intent in connection with their findings on the principal offense of desertion. Certainly there is sufficient evidence to support that finding. While the accused makes some showing of intoxication, his whole pattern of conduct permitted a finding that he was mentally capable of forming a specific intent to leave the service permanently. These facts and circumstances form the predicate: Some witnesses characterized him as being sober; others say he was intoxicated but knew what he was doing; he planned a destination in Soviet-controlled Germany; he fully recognized his direction of travel; he persisted in his efforts to get over the border in utter disregard of the warnings and advice of a number of people; he comprehended that he might get shot by the border patrol if he continued on; when interrogated as to his destination, he replied, "I am trying to go to the East Zone"; and, when finally taken into custody, he coherently related to a military police officer his activities during the day. When I consider those facts and circumstances, I cannot say that reasonable minds could not reach the conclusion that the accused had not reached that state of alcoholic stupefaction which would preclude him from forming a specific intent to leave the United States forces permanently.

For the reasons which I have mentioned, I would reverse the conviction of desertion alleged in Charge I and affirm a finding on the lesser included offense of attempted desertion. United States v Gibson, 3 USCMA 512, 13 CMR 68. I would affirm the conviction as to Charge II. Because this case does not at all present the kind of situation I found in United States v Voorhees, 4 USCMA 509, 16 CMR 83, and there is neither logic nor utility in requiring a new court to be convened to impose a sentence in this instance, I would return the record to The Judge Advocate General of the Army for reference to a board of review for redetermination of sentence appropriateness.