UNITED STATES, Appellee

v.

ROBERT H. TAYLOR, JR., Private E-1,
U. S. Army, Appellant

5 USCMA 178, 17 CMR 178

No. 3588

Decided November 26, 1954

CAPT William C. Irby, Jr., U. S. Army, and 1ST LT Joseph B. Axelman, U. S. Army, for Appellant.

LT COL William R. Ward, U. S. Army, MAJ Irvin M. Kent, U. S. Army, and 1ST LT Martin Blackman, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

This case is before us on petition of the accused. An Army general court-martial found him guilty of the wrongful possession of marijuana cigarettes—specified as a violation of the Uniform Code of Military Justice, Article 134, 50 USC § 728. The convening authority approved the findings and so much of the sentence as provided for dishonorable discharge, total forfeitures and confinement at hard labor for one year, but suspended the execution of the punitive discharge. A board of review affirmed this action—and thereafter we granted the accused's petition for review.

II

At the trial Government witnesses brought out that two marijuana cigarettes were found in an overcoat hanging in Hut 43, Company 6, Camp San Luis Obispo, California—a structure occupied as living quarters by the accused and at least one other person. This discovery was made in the course of a search of the building by a military police investigator together with the Officer of the Day. No objection was

179

raised at the trial to the legality of this search. The investigation with which we are concerned came about through the report to law enforcement authorities of information indicating that the accused was in possession of marijuana. When the investigators entered the hut to begin the operation, they discovered that the wardrobe facilities available to occupants consisted of a series of pegs on which the accused, together with another or others, hung his personal effects.

The accused was asked to point out the clothing items which were his property. He complied—and, among other belongings, identified the overcoat in which the cigarettes were later found. At the trial defense counsel objected strenuously to the admission of the statement by the accused which served to identify his clothing. However, the objection was overruled by the law officer on the ground that the former's remarks did not constitute "an incriminating statement," but amounted to no more than an answer to "generalized questions." Following discovery of the cigarettes, the accused was warned of his rights—as required by Article 31, 50 USC § 602—and a short time thereafter he executed a full confession. This confession was also held admissible by the law officer.

Three principal issues appear to be involved: (1) Was the identifying statement of the accused secured by the investigators in violation of Article 31? (2) If so, was the subsequent confession a "fruit of the poisonous tree"? (3) Assuming that Article 31 was violated, but that this vice did not taint the later confession, must reversal follow despite the presence of compelling evidence of the accused's guilt?

## III

We address ourselves now to the first of these questions. Pertinent portions of Article 31 of the Uniform Code are set out below:

"(a) No person subject to this code shall *compel* any person to incriminate himself or to answer any question the answer to which *may tend to incriminate him.*

"(b) No person subject to this code shall *interrogate, or request any statement from,* an accused or a person *suspected* of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement *regarding the offense* of which he is accused or *suspected* and that any statement made by him may be used as evidence against him in a trial by court-martial.

.    .    .    .    .    .

"(d) No statement obtained from any person *in violation of this article,* or through the use of coercion, unlawful influence, or unlawful inducement shall be received in evidence against him in a trial by court-martial." [Emphasis supplied.]

It is evident from the foregoing that, if the accused's identifying statement was "obtained . . . in violation of" Article 31, the law officer erred in admitting it. It is also perfectly clear that no sort of warning was furnished the accused until after ownership of the overcoat had been admitted by him and the two cigarettes found. It follows then that the Article's terms were violated if Taylor's statement either was compelled and "tend[ed] to incriminate him," or may be said to have been one "regarding the offense of which he . . . [was] accused or suspected." It is undeniable that at the time of the search the accused was suspected of possessing marijuana—for the law enforcement authorities were acting on a reliable "tip" that he did so. Thus the possible inquiries narrow to two: (1) Was the statement compelled, and did it tend to incriminate? (2) Did it regard an offense?

The protection granted by Article 31 (a), against being compelled to respond to a question the answer to which may tend to incriminate, is essentially similar to that provided by the Fifth Amendment to the Constitution. Cf. Counselman v. Hitchcock, 142 US 547, 35 L ed 1110, 12 S Ct 195. "Undoubtedly, it was the intent of Congress in this division of the Article to secure to persons subject to the Code the same

rights secured to those of the civilian community under the Fifth Amendment to the Constitution of the United States —no more and no less." United States v. Eggers, 3 USCMA 191, 11 CMR 191. Accordingly, we must turn for guidance to the cases decided under that Amendment.

Of course, an answer cannot be said to incriminate—or to tend in this direction in a legal sense—if it ▮▮▮▮▮ neither "led nor could have led to a [possible] discovery of his [the accused's] crime." Heike v. United States, 227 US 131, 57 L ed 450, 33 S Ct 226; Mason v. United States, 244 US 362, 61 L ed 1198, 37 S Ct 621; United States v. St. Pierre, 128 F2d 979 (CA2d Cir). Thus, it is clear that an answer to an inquiry seeking, say, one's name would not, under most circumstances, tend to incriminate —although in a sense evidence of identity would be relevant to formal proof of any charge against an accused. Heike v. United States, supra. On the other hand, "the chase must not get too hot; or the scent, too fresh." United States v. Weisman, 111 F2d 260 (CA 2d Cir).

Of late the Supreme Court has reaffirmed its determination to afford full protection to a suspect against being compelled to reply to questions the answers to which might tend to incriminate him—and in this connection has donned a somewhat presbyopic pair of spectacles. Blau v. United States, 340 US 159, 95 L ed 170, 71 S Ct 223; Hoffman v. United States, 341 US 479, 95 L ed 1118, 71 S Ct 814. In the first of the cited cases the privilege was brought into play by certain general questions directed to the petitioner by a Federal grand jury and relating to the Communist Party of Colorado. In the latter, it was extended to cover an apparently innocuous question concerning the nature of the witness' business.

Arguably the case at bar would fall within the broad sweep of these decisions. Of course, the question ▮▮▮▮▮ was addressed to the accused at a time when the investigators were not yet aware that the hut contained marijuana. At the same time they had reason to believe that a search of the accused's belongings located there might lead to this knowledge. To lessen their efforts, the searchers sought to draw on the accused's familiarity with his own property. Because of what they hoped to find, it was entirely foreseeable that this information from the accused would aid ultimately in drawing tightly the net of guilt. Certainly the information, coming as it did from the accused himself, would forestall any subsequent contention by him—in the event of discovery of marijuana in the clothing identified as his own—that the items of apparel belonged to another person.

For two reasons, however, we need not now decide whether the question tended to incriminate. In the first place, there is no indication that the accused's remark was *compelled* within the meaning of Article 31(*a*). Secondly, it is to be observed that Article 31(*b*) goes well beyond the provision that an accused or suspect may be required to answer only those questions which do not tend to incriminate him. In addition —as the Article plainly says—it may not be demanded that he make *any* statement "regarding the offense of which he is accused or suspected," quite apart from whether he feels that his truthful reply would serve to incriminate him. United States v. Williams, 2 USCMA 430, 9 CMR 60.

Did the accused's statement here "regard" the wrongful possession of marijuana cigarettes—the offense of which he was suspected? We cannot avoid the conclusion that it did. To be sure, the investigators' inquiry made no allusion to marijuana or any other contraband —and, standing alone, the response of the accused was wholly neutral. However, even within the more rigid confines of the privilege against self-incrimination, there exists no requirement that a challenged question or answer bear on its face the unmistakable stamp of lawlessness. Thus, in the Hoffman case, supra, the question concerning the witness' occupation on its face would appear to be wholly innocent—yet a truthful answer to it might have incriminated and so could not be compelled. Germane in the present context

**181**

is the comment of Congressman Elston concerning another Article 31 problem that "The best criminal investigator will take the least little thing and sometimes develop something from it." Hearings before the House Committee on Armed Services, 81st Congress, 1st Session, on H. R. 2498, page 985.

With these considerations in mind, we must doubt that a remark identifying apparel, in which the presence of an illicit drug is suspected—and ultimately found—does not "regard" the offense of wrongfully possessing that drug. Dictionary-wise this certainly must be sound, for we are told that—within the sense of the Article—the word "regard" means "to have relation or respect to; concern." Webster's New Collegiate Dictionary, 1951 ed., page 712. Of course, just as there are degrees of relevance, so too there may be gradations of "regarding." We would not, for example—and in this setting—animadvert on an unwarned inquiry seeking personal identification of the accused. Yet in the case at bar, we believe, the chase had become "too hot; . . . the scent, too fresh"—as the Circuit Court remarked in the Weisman case, supra, in seeking to delimit the tendency to incriminate.

Admittedly, reasonable minds may differ over the location of the critical line in the present problem, and we have no wish to criticize the law officer for his views on whether the colloquy incriminated, or his apparent ones to the effect that it did not "regard" the offense of which the accused was suspected. We are sure, however, that to hold the accused's remark inadmissible best serves the clear Congressional purpose discernible from all four corners of Article 31. Moreover, administrative considerations impel us in this direction —for we are quite without disposition to encourage experimentation on the part of military law enforcement personnel with the limits of Article 31. Another view—we are afraid—would result in a proliferation of appeals to determine the import of "regarding the offense."

We are sure that once military law enforcement authorities, engaged in an official investigation of crime, have identified a suspect from whom they desire any sort of oral or written statement touching the subject matter of the investigation, they must, before proceeding with the investigation, provide the warning demanded by Article 31—if his statement is to be usable against him. To say that this places an insupportable burden on the investigative and enforcement agencies of military law is to talk nonsense. Thus, in the case before us now, the investigators concerned would have lost nothing by pausing to inform the accused of his rights under Article 31, and of the offense of which he was suspected. Thereafter, if he declined to identify his clothing, they could (a) have sought identification from other occupants of the hut; or (b) looked for identification marks on the garments which would reveal their ownership. In any event, although a heavier burden had been placed by Congress on military investigators than is visible here, this Court —like the several Armed Forces—would nonetheless be bound by that mandate.

But the suggestion has been voiced that we do not have before us an Article 31 issue at all. To be sure, the investigators into whose conduct we are inquiring were not primarily seeking a testimonial statement within the thrust of the cited Article, but instead were in quest of real evidence. In the course of this quest, they sought of the suspect not an identification of himself as a culprit, but solely one relating to the property or premises to be searched. A superficial validity does attach to this search and seizure approach, but it is not an essential one. Although real evidence was indeed being sought, the investigators were also attempting to insure that such evidence, if discovered, could be related to the accused by means of an utterance on his part. The discovery of the marijuana can scarcely be deemed attributable to the accused's identifying remark. Yet the circumstance that its possession was irrefutably connected with him at the trial *is* attributable to that remark. Indeed, aside from the clear connection revealed thereby, the Government would not have sought so vigorously—and over defense

objection—to introduce the accused's identification of his garments. The hut shared by the accused might literally have teemed with marijuana, but if its wrongful possession could not have been brought home to the accused —by his own admissions or otherwise —no supportable conviction could have come about. Thus, to say that the present problem is merely one of search and seizure is to err in analysis.

IV

It follows from what has been said that the accused's statement was secured by the investigators, and received by the court-martial in violation of Article 31, and it follows in turn that reversal must result—on the basis of the doctrine of general prejudice. In United States v. Wilson, 2 USCMA 248, 8 CMR 48, we emphasized that we would "regard a departure from the great mandate of the article as generally and inherently prejudicial." In United States v. Williams, supra, we reiterated that we regarded a violation of the warning requirement of Article 31 as "so important, policywise, as to cause invocation of the doctrine of general prejudice, thereby rendering unnecessary an inquiry as to whether improper consideration of the confession was specifically prejudicial to the accused's substantial rights." We note that the pronouncements of those cases cannot here be distinguished on procedural grounds—this for the reason that defense counsel objected vehemently to the court's reception of the accused's identifying statement concerning the clothing which belonged to him, and because the record clearly discloses that the remarks by the accused preceded a reading of Article 31. See United States v. Josey, 3 USCMA 767, 14 CMR 185.

V

Three issues were stated in an early paragraph of this opinion. The second of these was based on the assumption that Article 31 had been violated, and inquired whether the accused's subsequent confession must be regarded as a product of this vice—and thus inadmissible. In view of the basis for our disposition of the case, it is unneces-

sary that we answer this question. We shall, therefore, assume that no error was committed by the law officer in admitting it.

Turning to the final issue, we must dispose of the contention that, conceding error in the admission of the accused's identifying statement, the findings of guilty must be affirmed under the compelling evidence rule by reason of the presence before the court-martial of Taylor's complete confession of guilt, together with satisfactory evidence of the *corpus delicti*. No extensive discussion of this question is required—for it must be apparent that we cannot accept the position which Government appellate counsel have urged upon us.

In United States v. Morris, 4 USCMA 209, 15 CMR 209, we ruled that "Our general premise must certainly be that a violation of the accused's privilege against self-incrimination will necessitate reversal regardless of the presence of compelling evidence of guilt." Although we spoke there of the privilege against self-incrimination, we find no basis for distinction in the circumstance that we are met here by the violation of another provision of Article 31. It is true that in the Morris case the majority—the Chief Judge dissenting—found reasons in the previous decisions of this Court for affirmance. It is equally true, however, that these reasons are inapplicable to the case at bar.

Given the very nature of the thinking behind the notion of general prejudice —its ideal core—it must be apparent that no place may be found within it for the compelling evidence rule. United States v. Lee, 1 USCMA 212, 2 CMR 118; United States v. Bound, 1 USCMA 224, 2 CMR 130; United States v. Berry, 1 USCMA 235, 2 CMR 141; United States v. Williams, supra; United States v. Wilson, supra; United States v. Woods, 2 USCMA 203, 8 CMR 3. This must be our working rule. It is, we believe, wholly consistent with analogies found in Federal civilian law. See, e.g., Kotteakos v. United States, 328 US 750, 764, 90 L ed 1557, 1566, 66 S Ct 1239.

VI

Accordingly, the decision of the board

**183**

of review is reversed and a rehearing is directed. The record is returned to The Judge Advocate General, United States Army, for appropriate action.

Chief Judge QUINN concurs.

LATIMER, Judge (concurring in the result):

I concur in the result.

I am in agreement with the conclusions reached by the majority that the statements made by the ▮▮▮▮▮ ▮ accused in which he identified the marking in his clothing and admitted the ownership of the overcoat were elicited in violation of Article 31(b) of the Uniform Code of Military Justice, 50 USC § 602. That Article prohibits persons subject to the Code from interrogating, or requesting any statement from, without prior warning, one suspected of an offense regarding the offense of which he is accused or suspected. There may be instances when similar questions would properly constitute a mere incident to the search and seizure and, in a different setting, to require a person to identify his property might be permissible. However, in this instance the record is clear that this accused was the only person on the premises at the time the statements were requested; the officers suspected that he was the possessor of marijuana at the time he was asked to identify his clothing; the questions were asked for the specific purpose of connecting him with the suspected offense; and the identification was an important link in the chain of circumstantial evidence.

I need not concern myself with arguing the merits of the contention that the accused was required to incriminate himself as subparagraphs (b) and (c) of Article 31 of the Code are controlling. They provide:

"No person subject to this code shall interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

"No person subject to this code shall compel any person to make a statement or produce evidence before any military tribunal if the statement or evidence is not material to the issue and may tend to degrade him."

Here, there was an investigation, the accused was interrogated, he was suspected of the offense of possessing marijuana, it was anticipated the drug would be found in his personal possessions, and an admission of their ownership could be of value only as evidence connecting him with the suspected crime. He was not warned, and his answers were admitted as evidence against him. The conclusion follows that the quoted provisions of the Article were violated and that error was committed in allowing the testimony to be introduced.

I do not concur with that portion of the opinion which bases reversal upon the grounds of general prejudice. Although that doctrine has been adopted as the law of this Court, I do not believe it necessary to resort to its extremes in the present instance. Nor do I believe the Government is correct in its contention that the compelling evidence rule necessitates affirmance in this case. My conclusion in this phase of the case is founded upon my determination that the confession, received in evidence against the accused, was the product of the unlawful activities of the officers and was, therefore, inadmissible. Hence, the competent evidence is insufficient to support the conviction.

In the case of United States v. DeLeo, 5 USCMA 148, 17 CMR 148, I developed my views on the question of whether a confession, resulting from leads unlawfully unearthed, was rendered inadmissible even though proper warning was given to the accused prior to the time the confession was made. There I was of the opinion that the clue had been obtained through an unlawful search and seizure. I reviewed the civilian cases in which evidence leading to confessions had been obtained through unlawful search and seizure

or by wiretapping. My research indicated, generally, that the courts have refused to allow the Government to use the fruits of the wrongdoing of its officers. My concepts are expressed in the following quotation from that case:

"If I follow the doctrine announced in those Federal cases, the confession with which we deal is inadmissible. There is, however, another facet of the problem which is present in military law but which is absent in civilian law. Under Article 31, Uniform Code of Military Justice, 50 USC § 602, an accused must be informed that he need not make any statement concerning the offense for which he is being investigated. There is no dispute that in this instance the accused was so advised. This poses a question as to whether such a warning cuts off the causal connection between the original illegal act and the giving of the confession. To furnish an answer, it is necessary to weigh the right of the Government to use a derivative confession partly insulated from its tainted source by a warning against the wrong which made its production possible. Both cannot be preserved. Generally speaking, the right of the Government must yield to the right to be secure in a home; but at times the violation of the latter may be so detached from the former that the taint has disappeared. Warning is a factor to be weighed in determining the attenuation. In this instance, as a matter of good sense and in spite of the warning, the connection between the confession and the illegal seizure had not become so attenuated as to dissipate the taint. While some time had elapsed, the freshly obtained evidence was spread before the accused and he was directed to explain his possession. The psychological disadvantage of being confronted with illegally obtained documents could hardly be more pronounced. The accused was faced with compelling evidence of guilt and given confusing instructions. He was first told he need make no statement, and an explanation was then demanded. With the fruits of the seizure staring him in the eye and with the possible choice of confessing his crime to his friends, or being further pursued by the French, he was left a difficult choice. Arguments on abstract theories vanish when the poisoned fruit is the bait used to lure the accused to talk. In the instant case, he seized the bait and now the Government asserts it should be the beneficiary of the wrong. Having set the chain of circumstances in motion by an illegal venture, it seems only just that the Government should not profit by the fruits of its wrongdoings."

In the instant case the issues are parallel as we must deal with a violation of Article 31(b) which directly connected the accused with the offense, and which led to the discovery of the marijuana cigarettes. Immediately upon their discovery, the accused was hustled forthwith to the provost marshal's office, and after receiving a warning, he signed a confession to the crime. The warning at that time was a hollow ritual. After obtaining illegally the necessary information to convict the accused, the Government agents then informed him he need not talk. Trapped by his own admission of guilt, he was confronted with a hopeless choice. Colloquially speaking, his was not a free choice to let the "cat out of the bag." Here the Government agents lured it into the open. Under those circumstances to hold that the confession was competent would permit the Government to profit by its own wrongdoing.

I would hold the confession inadmissible and its reception prejudicially erroneous.