UNITED STATES, Appellee

v

CASPER L. NOWLING, Basic Airman, U. S. Air Force, Appellant

9 USCMA 100, 25 CMR 362

No. 9907

Decided April 4, 1958

*Captain Richard C. Bocken* argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel Ellis L. Gottlieb* and *Lieutenant Colonel R. W. Dech.*

*Lieutenant Colonel James R. Thorn* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Francis P. Murray* and *Lieutenant Colonel Robert W. Michels.*

## Opinion of the Court

HOMER FERGUSON, Judge:

During the early morning hours of November 15, 1956, the accused was seen in the Air Police Operations Office, Sheppard Air Force Base, Texas, by Airman Second Class Williamson, an air policeman. The accused had apparently been apprehended at the main gate for a uniform violation. The usual practice in such cases was to have the man's Class "A" pass "pulled." Sometime that evening Williamson, while on town patrol in Wichita Falls, Texas, observed the accused sitting at a table in a local night spot called the "Cotton Club." Although he was "not sure" that the accused's Class "A" pass had been taken away, he strongly suspected that he did not have one. He waited until the accused left the club, and then approached him and asked to see his pass. The accused complied with the request and displayed an Armed Forces Liberty Pass DD Form 345, bearing the name of one "John G. Hensley." This, of course, did not correspond with the accused's identification card and he was taken into custody.

At trial, the defense counsel objected to the introduction of the pass (Prosecution Exhibit 1) in evidence on the ground the air policeman had failed to advise the accused of his rights under Article 31 though he suspected him of having committed an offense. The objection was overruled and the prosecution exhibit was admitted in evidence. We granted review to consider the correctness of the law officer's ruling in this matter.

The accused was charged *inter alia* with the offenses of being drunk in a public place and wrongful possession of an unauthorized pass with intent to deceive, both offenses being in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. The law officer granted the accused's motion for a finding of not guilty as to the offense of being drunk in a public place but he was found guilty of wrongfully possess-

**101**

ing an unauthorized pass with intent to deceive.

The record leaves little doubt but that the accused was a suspect within the meaning of Article 31, Uniform Code of Military Justice, 10 USC § 831. The testimony of Williamson clearly indicates that he had strong reason to suspect the accused of being guilty of a pass violation. In addition, he testified that while observing the accused in the club, he considered him to be neither drunk nor disorderly and that the only reason his attention was drawn to him was because he "had ssen [sic] him earlier in Air Police Operations." This latter testimony was obviously accorded great weight by the law officer in sustaining the accused's motion for a finding of not guilty as to the offense of being drunk in a public place.

The language of Article 31, supra, is clear and unequivocal. Section (b) provides that no person subject to the Code shall interrogate or request any statement from "an accused or a person suspected of an offense" without first advising him of his rights under the Article. Any statement obtained "in violation of this article" is inadmissible in evidence. Section 31(d), supra. While it is true that here there was no request that the accused make a statement, there was, however, a request that he produce identification. The distinction between oral declarations and physical acts for the purpose of requiring a warning under the Article has been specifically rejected by the Court. In United States v Holmes, 6 USCMA 151, 19 CMR 277, the record showed that agents suspecting an accused of having committed an offense under the Code asked him to show them certain articles of his clothing. The accused complied with the request, although there was no warning under Article 31, supra. The Government urged in that case that physical conduct is not a "statement" and therefore there was no need to advise the accused of his rights. A majority of the Court, however, held otherwise and reasoned as follows:

". . . At a trial when a witness is asked a question to which he replies by nodding his head, that action con-

stitutes his testimony. By the same standard, when a law enforcement agent asks a question 'regarding the offense' of a person suspected of a crime, the suspect's reply is a statement, whether it consists of an oral declaration or a physical act. In either case, the reply is 'an affirmative conscious act on the part of the individual affected by the demand' and therefore within the purview of Article 31. United States v Rosato, 3 USCMA 143, 147, 11 CMR 143."

We conclude, therefore, that the accused's conduct in producing the pass at the request of the air policeman was the equivalent of language which had relevance to the accused's guilt because of its content. See United States v Taylor, 5 USCMA 178, 17 CMR 178.

The Government urges that the decision of the board of review in United States v Williamson, ACMS–14116, November 28, 1956, requires affirmance of the accused's conviction. The accused there, as in the instant case, was charged with wrongful possession of a false pass, with intent to deceive. The evidence showed that a senior training noncommissioned officer was required to know whether or not airmen of his squadron were on duty at all times, and if not, whether they had a valid pass or were authorized to be off-duty. He had reasonable grounds to suspect that the accused was not present for duty and did not have a pass. The accused was called into his office and without being advised of his rights, was required to produce his pass which turned out to be false. At trial, the pass was admitted in evidence over defense objection that the accused had not been advised of his rights under Article 31, supra. In affirming the accused's conviction, the board said in pertinent part that:

". . . To hold that Article 31 requires a preliminary warning to such an order or request would be to hold in effect that an airman could refuse to surrender or show his pass. Otherwise, the warning would be completely meaningless. It is obvious that an airman has no such right and that Article 31 was never intended to create such a right. Accordingly, we conclude that such an order or request

does not constitute an 'interrogation' within the meaning of Article 31 and a warning of the rights conveyed by Article 31 is never a preliminary requirement to such order or request. This is true whether or not the request or order is given isolatedly or during the course of an official interrogation of an airman who is accused or suspected of an offense. Moreover, an order or request that an accused or suspect surrender or show his pass does not call for an incriminatory 'statement' within the meaning of Article 31, but only requires that the airman surrender or show his pass if he has one. The giving of such an order or request is to be distinguished from the circumstances where, during an investigation, an accused or suspect is asked a question and in reply makes a 'statement', either by way of oral declaration or physical act, that constitutes a communication against interest. In the latter circumstance, the questioning of accused clearly amounts to an 'interrogation' and his reply (either by oral or by physical act) constitutes a 'statement' within the purview of Article 31 (United States v. Holmes, 6 USCMA 151, 19 CMR 277; United States v Taylor, 15 USCMA [sic: 5 USCMA] 178, 17 CMR 178)."

We find the reasoning of the board of review in the *Williamson* case unpersuasive and expressly decline to follow it. The distinction it attempts to draw is not only artificial and without basis in either law or logic, but runs contrary to the meaning and spirit of Article 31 (b) of the Code, supra.

We are not to be understood as holding that every routine or administrative check by an air policeman of a serviceman's pass or identification card must first be preceded by an Article 31 warning. However, when a reasonable suspicion exists, as in the instant case, that a pass violation is being committed, the suspect must be advised of his rights before an examination or surrender of his pass is requested. Under such circumstances the request to produce amounts to an interrogation and a reply either oral or by physical act constitutes a "statement" within the purview of

Article 31, supra. United States v Holmes, and United States v Taylor, both supra. Of course, while we recognize that a pass is a privilege this is not to say that incidents which grow out of the use of such pass are not entitled to the protection of Article 31. Cf. United States v Johnson, 7 USCMA 488, 22 CMR 278. An excellent decision highlighting the distinction between a routine pass check on the one hand and an order to produce a pass based on a suspicion that a pass violation has occurred on the other, is the case of United States v Meyers [ACM S–8174], 15 CMR 745. There, a gate guard, while conducting a routine pass check of airmen leaving the base, discovered the accused in possession of an unauthorized pass. No warning pursuant to Article 31 of the Code, supra, was given prior to a request that the accused produce his pass. Statements made by the accused at the time were admitted in evidence. In affirming the accused's conviction of a wrongful possession of an unauthorized pass, the board held the accused's statements were properly admitted into evidence. In its opinion, the board said:

". . . we are convinced that a gate guard, when questioning an airman about his pass, in the routine manner shown here, is conducting neither a formal nor informal investigation of an offense as that term is used in paragraph 140a of the Manual. Were it otherwise, we would be faced with the prospect, ridiculous as it may seem, of finding service personnel having to queue up at innumerable military checkpoints so that Article 31 may be read to them before being questioned concerning their authority to enter or leave the installation."

In holding that Article 31(b), supra, did not apply under those circumstances, the board made it clear that it "by no means intend[ed] to imply that *carte blanche* should be given such air policemen as a class. Their questioning may well reach the level of an 'investigation' in a different factual setting, thus necessitating invocation of the proscription contained in Article 31 (see ACM 6858, Murray, . . . [12 CMR 794]).

**103**

The line of demarcation of course, cannot be drawn with mathematical precision and each case is necessarily governed by its own facts and circumstances." We believe the board's holding in the *Meyers* case is correct and that the instant case represents the "different factual setting" there contemplated.

We are not impressed by the Government's argument that had the accused refused to produce the pass, he could have been searched and its presence discovered. This argument falls wide of the mark for the truth of the matter is that there was no lawful arrest present. The decision of the board of review is reversed. The record is returned to the Judge Advocate General of the Air Force for reference to a board of review for reassessment of a sentence on the basis of the remaining approved finding of guilty.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting) :

I dissent.

The interpretation of Article 31 has been a source of considerable difficulty to those administering military law and this case answers wrongly the critical problem of how to balance the right of the military services to grant privileges to their personnel and at the same time retain some control over those who abuse the favor. If a pass is the evidence which permits one on active duty to establish his privilege to liberty from his unit, those charged with the responsibility of maintaining law and order should possess the authority to require him to produce his credentials. For many years the services have required a member to show his authority to be absent from duty and if ever there was a custom which has been universally adopted in the military, it is this one, and I believe the necessities of the service require that it must not be restricted by unrealistic conditions. The services perform duties around the clock and theoretically their members must be available for, or on duty with, their units twenty-four hours per day. Wars are not fought on a forty-hour per week schedule and personnel shortages are critical. Experience has taught that straggler lines are necessary and every soldier must at the risk of his personal safety show his authority to pass through. Unfortunately, absenteeism is a most prevalent vice in the military, and taverns, bars, and hideaway places in towns are the favorite rendezvous for those individuals who seek to escape duty. In wartime, deserters must be ferreted out and returned to military control. Whether guilty or not, absentees are suspected of an offense when found outside of military areas, but to avoid injustices to those who may be innocent, apprehending personnel ask for credentials. Refusal to comply must of necessity result in arrest. In addition, in peacetime, the inspection of passes is the one means by which the military service can retain some semblance of order, and if every soldier, sailor, marine, airman, or coast guardsman cannot be ordered to show his credentials when off station, then the services have lost a valuable tool in maintaining discipline in the units and friendly relations with the civilian community. Certainly, I have a feeling that denying the military service this authority will result in either the loss of liberties to enlisted men or an increase in unauthorized absences, and a weakening of the maintenance of order in civilian communities. The changes wrought by the limitations imposed by this decision seem to me to be so great that I am convinced that members of Congress did not envision this result when they enacted Article 31. And I believe a reasonable interpretation of that Article would not strip military authorities of their necessary powers.

Obviously, a reading of the Court's opinion will convince the reader that my associates seek to limit the scope of their holding to avoid the results I mention. But I assert that their reservation is not logical and their reasoning unsupportable for it is my contention that if the physical handing of a pass from one individual to another upon demand is a statement within the meaning of Article 31, it is a statement regardless of whether the one who orders production suspects the other of an offense. True it is that Article

31(b) provides that as a condition precedent to obtaining a statement which is admissible in evidence, a person subject to the Code must warn one suspected of an offense before interrogating or requesting a statement from him, but that does not reach the heart of the problem for two reasons. First, the handing over of a pass is a physical act which does not change its character to that of a statement because the holder may be a suspect. Second, Article 31(a) provides that a person subject to the Code shall not be compelled to incriminate himself and one ordered to produce his pass complies under compulsion. Therefore, if as this decision holds this is a case of a compulsory statement, Article 31(a) would prohibit its admission into evidence, regardless of the interrogator's suspicions. Accordingly, it would follow logically that even the gate guard mentioned in the Court's opinion could not order a returnee to produce his pass, for compulsory statements tending to incriminate are not conditioned upon suspicion. But, in addition, many of the persons approaching guard stations are themselves telling evidence of the commission of offenses such as being under the influence of liquor or habit-forming drugs and having been involved in altercations, and I suppose guards would suspect them of those offenses. Furthermore, the service police who patrol the trains, railroad stations, streets of a city, or other places used by military personnel may believe they are dealing with offenders and they will be hamstrung if they must limit their demands to those individuals whom they do not suspect. In order to maintain any semblance of control, the time for demanding identification ought to be when suspicions are aroused. Therefore, reservations to the contrary notwithstanding, the practical effect of the majority opinion is to penalize the services in their efforts to maintain order and discipline.

Before proceeding with my views, I believe one preliminary matter should be mentioned. The majority holds that before demanding the production of a pass, the military policeman must warn the suspect of his Article 31 rights, but I wonder what form the warning would take. The person warned would only understand a statement to be a verbal utterance, and, if the warning is to have the desired results, he must be informed that he is not required to produce a pass. That would bring about this peculiar stalemate. The person involved must first be told that he need not comply with the order and then he is ordered to show his authorization for absence. If he follows the warning and refuses to produce the pass, the only recourse left to the policeman is to apprehend the suspect, search him on the spot or return him to the base, have him searched and obtain possession of the pass in that manner. That would be undesirable because it would force a number of unnecessary apprehensions, and, instead of aiding the military in maintaining order, it would be a source of many disputes between the military policeman and the man under suspicion. While the Court concludes this accused could not be apprehended, I contend to the contrary. Pretermitting the pass offense, he was charged with being drunk in public, and that would justify his being taken into custody. If that is not sufficient, then I call attention to the fact that the Court finds the air policeman suspected the accused of a pass offense. The record shows reasonable grounds for that belief, and Article 7 of the Code authorizes apprehension under those conditions. Apprehension would follow as a matter of course.

Now for my reasons for disputing that the handing over of a pass is a statement. I have no argument with the rationale of United States v Holmes, 6 USCMA 151, 19 CMR 277, but I cannot see its application to the facts in this case. There we held that pointing out one's belongings was equivalent to a statement for the purposes of necessitating an Article 31 warning. However, we did not go so far as to say that reaching in a pocket, withdrawing a paper and passing it to a second party was a statement which called for an Article 31 warning. Rather, the reasoning of that case can only be applied to those physical acts which are in the

105

nature of an admission which the accused alone can give.

A better understanding of the problem may be obtained when oral statements are considered in relation to other acts of self-incrimination prohibited by Article 31. Judge Brosman made a distinction some time ago in United States v Eggers, 3 USCMA 191, 11 CMR 191, between acts which were and those which were not self-incriminatory. In that case he spoke for a unanimous Court and said:

"We believe the sound answer to be provided in Beltran v Samson and Jose, supra, and in Wigmore's Code of Evidence, supra. Law enforcement authorities could *not* require a man to produce his diary—a pre-existing sample of handwriting—for use in evidence against him. United States v White, supra. Would it then make anything but nonsense to say that the same man *could* be compelled to seat himself in the presence of the same authorities and to execute several pages in longhand? Certainly not. Indeed, there is a distinct difference between the present handwriting problem, on the one hand, and the fingerprint and the foot-in-footprint situations, on the other. The latter require only *passive* cooperation, whereas the former require *active* participation and *affirmative* conduct in the production of an incriminating document not theretofore in existence. To the same effect is our decision in United States v Rosato, 3 USCMA 143, 11 CMR 143, decided July 31, 1953."

In reviewing United States v Eggers, supra, and other decisions at a later time I said:

". . . Specifically, we concluded in United States v Rosato, 3 USCMA 143, 11 CMR 143; United States v Eggers, 3 USCMA 191, 11 CMR 191; and United States v Greer, 3 USCMA 576, 13 CMR 132, that an accused is protected by the provisions of the Uniform Code of Military Justice from being compelled to give evidence against himself either by word of mouth or by furnishing specimens of his handwriting. In those holdings,

we attempted to distinguish the handwriting and verbal utterance situations from the fingerprint, foot-in-footprint, coat and hat fitting cases, on the grounds that the former required active and conscious use of the mental faculties on the part of an accused to complete the chain of incriminating circumstances, while the latter involved the production of testimony which could be obtained without compelling the accused to use any of his senses to assist in his conviction." [United States v Williamson, 4 USCMA 320, 322, 15 CMR 320; see also United States v McCann, 8 USCMA 675, 25 CMR 179 (separate opinion).]

It becomes obvious from the foregoing quotations that we expressly held that a statement requires the active and conscious use of the mental faculties in the production of evidence not theretofore in existence. We did not part from that concept in United States v Holmes, supra, for in that instance the active and conscious use of the mental faculties were required because the accused was required to identify his own clothing. No one else could perform those mental processes for him.

In the instant case, only the accused's physical—not mental—cooperation was required when he was requested to produce his pass. The difference between the act called for here and the one required of the accused in United States v Holmes, supra, is obvious. If *Holmes* had refused, the Government would have been denied the benefit of his personal testimony. Here, there was no verbal admission and had the accused refused to hand over the pass, I am certain that it would have been proper for the air policeman to have apprehended him and taken the identifying card from him. In that event, the Government would have had the same evidence and none of the mental faculties of the accused would have been involved. Stated in a slightly different manner, an order by an air policeman which merely imposes a military duty on a serviceman is not an interrogation and compliance therewith is not a statement.

My reasoning is supported by the

board of review holding in United States v Williamson, ACMS–14116, November 28, 1956. Contrary to my associates, I find the rationale of that case to be logical and persuasive. For the benefit of the reader, I quote it in part:

"The instant trial does not involve a question of the receipt in evidence of *oral* admissions of the accused as such evidence was excluded on objection of the defense. The critical question in the instant case is whether or not a request by competent authority that an airman show his pass is an 'interrogation' within the meaning of Article 31 of the Code and whether or not an airman's act in response to the request to show his pass is a 'statement' by physical act within the meaning of that Article. As pointed out, *supra*, competent authority has an unqualified right to order or request an airman to show or surrender his pass at any time and under any circumstances. To hold that Article 31 requires a preliminary warning to such an order or request would be to hold in effect that an airman could refuse to surrender or show his pass. Otherwise, the warning would be completely meaningless. It is obvious that an airman has no such right and that Article 31 was never intended to create such a right. Accordingly, we conclude that such an order or request does not constitute an 'interrogation' within the meaning of Article 31 and a warning of the rights conveyed by Article 31 is never a preliminary requirement to such order or request. This is true whether or not the request or order is given isolatedly or during the course of an official interrogation of an airman who is accused or suspected of an offense. Moreover, an order or request that an accused or suspect surrender or show his pass does not call for an incriminatory 'statement' within the meaning of Article 31, but only requires that the airman surrender or show his pass if he has one. The giving of such an order or request is to be distinguished from the circumstances where, during an investigation, an accused or suspect is asked a question and in reply makes a 'statement,' either by way of oral declaration or physical act, that constitutes a communication against interest. In the latter circumstance, the questioning of accused clearly amounts to an 'interrogation' and his reply (either oral or by physical act) constitutes a 'statement' within the purview of Article 31 (United States v Holmes, 6 USCMA 151, 19 CMR 277; United States v Taylor, 15 USCMA 178, 17 CMR 178.)"

My colleagues are impressed by the "excellent decision" of United States v Meyers [ACMS–8174], 15 CMR 745. I join with them, for it supports my views. In that case the necessity of exhibiting a pass to the air policeman without an Article 31 warning was assumed to be valid, and certain oral admissions which the accused made to the policeman in an ensuing conversation were held admissible. The underlying reason for the holding was founded on the board's conclusion that there was no formal or informal investigation, but this is what the members had to say about the right of the military to enforce discipline by the inspection of passes:

". . . In one sense of the word, everyone who attempts to pass the gate is a suspect and the suspicion is removed only by displaying the proper credentials or, having none, giving acceptable answers to questions asked by the guard. In a sense, also, everyone who is asked to show his pass is being 'investigated' so that his right to proceed on his way may be established. Nevertheless, we are convinced that a gate guard, when questioning an airman about his pass, in the routine manner shown here, is conducting neither a formal nor informal investigation of an offense as that term is used in paragraph 140*a* of the Manual. Were it otherwise, we would be faced with the prospect, ridiculous as it may seem, of finding service personnel having to queue up at innumerable military checkpoints so that Article 31 may be read to them before being questioned concerning their authority to enter or leave the installation. Before we

**107**

ascribe to Article 31, a purpose to overthrow military practice of long standing, to render the administration of security and discipline more difficult if not impractical, and to extend the protection against improperly obtained admissions beyond the bounds of reason, we would require from the legislative history of Article 31 (but have sought in vain) some suggestion that such was the congressional purpose."

Like the board of review in that case, I have been unable to find a single straw in the wind which would ascribe to Congress an intent to deny to the military the right to require production of identifying credentials.

One more concept is worth discussing. A pass is a privilege and the services have the right to attach conditions to its acceptance. Members of the Armed Services need not accept the privilege but once they do they have no right to complain about being required to comply with the reasonable conditions imposed. In that connection, I dare say that if I am stopped by a state highway patrolman in any one of the forty-eight states and ordered to show my driver's license, I have no constitutional privilege upon which I can legally base a refusal. Of course, if I do refuse, I suspect I will find myself trying to make bail.

I would affirm the decision of the board of review.