UNITED STATES, Appellee

v

CHARLES INSANI, Private First Class, U. S. Army, Appellant

10 USCMA 519, 28 CMR 85

No. 12,791

Decided July 2, 1959

*First Lieutenant Herbert R. Brown* argued the cause for Appellant, Accused. With him on the brief was *Captain Arnold I. Melnick*.

*First Lieutenant George J. Miller* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel James G. Mc-Conaughy*.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

A general court-martial convicted the accused of larceny of property of a value in excess of $50.00, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921. He appeals to this Court for reversal of his conviction on the ground that evidence obtained as a result of a search of his locker was erroneously admitted over his objection.

The evidence shows there were two searches. The first was conducted by three military police enlisted personnel; the second was with the authorization, and in the presence, of the accused's commanding officer. On the argument on the defense objection, trial counsel outlined the issue as follows: "If the first search was illegal, then the following search made after the first search is also illegal." See United States v Ball, 8 USCMA 25, 23 CMR 249. The validity of the first search depended upon whether the accused consented to open his locker pursuant to a request by military police or merely acquiesced "to the demands of a person having the color of office." United States v Wilcher, 4 USCMA 215, 218, 15 CMR 215. After taking testimony as to the circumstances under which the accused first opened his locker, the law officer overruled the defense objection. The ruling was considered and sustained by both the convening authority and the board of review. In its opinion the board of review observed that the Government's claim of waiver by the accused "of a fundamental right must be carefully examined"; it reviewed the evidence in detail and concluded the trial ruling was correct. We are unable to say that as a matter of law there is insufficient evidence to support the conclusion. See United States v Alaniz, 9 USCMA 533, 26 CMR 313.

Appellate defense counsel challenge the factual sufficiency of the board of review's conclusion on a narrow ground. They contend the "close relationship" between the protection against an unreasonable search and seizure and the privilege against self-incrimination requires that the Government show the accused was advised of his rights under Article 31 of the Uniform Code as "an essential element" of the claim of consent. See Tedrow, Annotated and Digested Opinions of U. S. Court of Military Appeals, 1959, page 450. On the other hand, the Government contends that consent to a search is "wholly neutral" in nature, and cannot be considered a statement "regarding the offense" within the meaning of Article 31, Uniform Code of Military Justice, 10 USC § 831.

Under Article 31, a person accused or suspected of an offense has, when interrogated, the right to be informed, first, of the nature of the alleged wrong: that he need not make any statement in regard to it; and, that if he does say anything, it may be used against him in a court-martial. If he is not so advised, a statement made by him is inadmissible in evidence against him. United States v Nowling, 9 USCMA 100, 25 CMR 362. This right is entirely different from the right to be free from unreasonable search. It is reciting the obvious to say there can be an interrogation without a search, and, conversely, a search without interrogation. Where there is either interrogation or a search, the admissibility of evidence obtained therefrom is ordinarily tested by the principles applicable to the one or the other, as the case may be, but not to both. In fact, the accused at least impliedly concedes that evidence obtained as a result of a search authorized by competent authority is not inadmissible because the accused was not advised of his rights under Article 31 before the search. See United States v Davis, 4 USCMA 577,

520

16 CMR 151. However, he maintains that a different rule should apply to a search based upon consent. He argues that by giving consent to a search he provides a "predicate for the admission" of any incriminating evidence which may be found as a result of the search and in effect his consent incriminates him.

Consent to a search is by itself in no way incriminating. It relates only to the preliminary question of the lawfulness of the search. In that regard it is no different from any other basis for a legal search. We perceive no sound reason to set it apart from the other bases for a search by requiring that the accused be first warned of his separate and different rights under Article 31. Of course, the fact that the accused is informed of his rights under Article 31 may be considered in determining whether the accused consented to the search or merely yielded to the color of authority. See United States v Burdick, 214 F 2d 768 (CA 3d Cir) (1954). But the absence of such advice does not preclude a finding of free and voluntary consent as a matter of law. This is not to say that a consent search will never present an occasion for informing the accused of his rights under Article 31. In a number of cases we have pointed out an important distinction between the legality of a search and the admission of evidence of identification of the property by the accused as property belonging to him.

In United States v Holmes, 6 USCMA 151, 19 CMR 277, and United States v Taylor, 5 USCMA 178, 17 CMR 178, law enforcement agents suspected the accused of violating the Uniform Code. In each case they proceeded to the accused's quarters to search his belongings. In neither case was the legality of the search questioned, but in each the accused was asked to, and did in fact, identify his clothing. We held that the evidence of identification was inadmissible because it constituted a statement obtained from the accused without preliminary advice as to his rights, which is required by Article 31 of the Uniform Code. More recently we considered the same problem in United States v Bennett, 7 USCMA 97, 21 CMR 223. We there said (pages 99–100):

"It is certain enough that some of the acts performed or words spoken by the accused during the search, particularly the pointing out of his locker and clothing at the request of an official investigator, amounted to a statement. It was 'language, or its equivalent.' United States v Ball, 6 USCMA 100, 19 CMR 226. Therefore, the Government agents had a duty to warn the accused of his rights under Article 31 of the Code before eliciting the information. Under our previous holdings, had the statements or clothing been offered in evidence, an objection to that proffered evidence would have been sustained. United States v Taylor, 5 USCMA 178, 182, 17 CMR 178. However, that question is academic in this setting, for the prosecution scrupulously refrained from using any evidence that was obtained prior to warning, and it came before the court-martial solely because defense counsel elicited a recitation of the incidents from one of the investigating agents."

No issue of identification of the locker was made at the trial and none is made on this appeal. The evidence tends to show that the locker was known to belong to the accused by means other than his identification. See United States v Bennett, supra, page 100. Accordingly, we affirm the decision of the board of review.

LATIMER, Judge (concurring):

I concur.

While I am in complete agreement with the Chief Judge that it is unnecessary that an accused be warned in accordance with the provisions of Article 31 in order to obtain his consent to a search, I deem it advisable in the instant case to comment briefly on the search itself.

A few basic principles dictate the correct conclusion. It is fundamental that the law officer's ruling on an interlocutory question such as the one with which we are here concerned will be reversed only when he abuses his discretion. Thus the matter is not before

us as an original proposition and the law officer's ruling should be sustained if the record shows any reasonable basis for it. And on appeal it should be borne in mind that for that purpose the evidence and inferences therefrom must be construed in a light favorable to the Government. True it is in this instance that if only the evidence favorable to the accused is considered, a showing in his favor can be made. However, when I apply what I believe to be the correct appellate principle, I join the Chief Judge in his holding that the record does not show the law officer abused his discretion in ruling accused consented to the search.

FERGUSON, Judge (dissenting):

I dissent.

In my opinion, the principal opinion, with its restrictive approach to the basic issue presented in this case, condones a flagrant abuse of the accused's constitutional protection against unreasonable search and seizure. While our grant of review concerned itself specifically with whether an accused must be advised of his rights under Uniform Code of Military Justice, Article 31, 10 USC § 831, prior to obtaining his consent to an examination of his belongings, neither the objection at the trial nor the arguments and briefs on appeal are so qualified. On the contrary, they address themselves directly to an inquiry into whether the accused, in fact, consented to the search of his wall locker. While I have serious reservations concerning whether an accused's statement of consent may properly be introduced into evidence without a demonstration that he was advised of his rights under Article 31, Code, supra, I prefer to dispose of this appeal on the basic question presented.

Charged with larceny, Insani's guilt is predicated solely on the inferences to be derived from his unexplained possession of recently stolen property, consisting of an electric razor, two cameras, and a camera case. It is also important to note the victims had cigarettes taken from them at the same time, although these latter items were not included in the larceny charge. Possession of the stolen property was developed from the testimony of accused's commanding officer who conducted a search of his locker at the behest of military policemen who had already partially investigated its contents. The policemen summoned the commander to complete the search when they noted the locker contained seven cartons of cigarettes and evaluated that fact in light of the items determined to be missing and the accused's indication he had visited the victims' quarters to obtain a cigarette. As the commanding officer's search was thus intimately connected with the earlier quest by the military police, its validity depends upon the legality of their actions. Silverthorne Lumber Co. v United States, 251 US 385, 40 S Ct 182, 64 L ed 319; cf. United States v Doyle, 1 USCMA 545, 4 CMR 137; dissenting opinion of Judge Latimer, United States v DeLeo, 5 USCMA 148, 17 CMR 148; Manual for Courts-Martial, United States, 1951, paragraph 152.

Preliminarily, it should be noted that the accused was observed sitting on a bed in the victims' room. Upon being asked the reason for his presence, he replied that he wanted a cigarette. Thereafter, he apparently returned to his own room and went to bed. The property in question was soon discovered to be missing, and military police were called. Three law enforcement agents, Sergeant Mutchler, Private First Class Riess, and Private First Class Nemac, arrived on the scene. After identifying the accused as the nocturnal visitor to the victims' quarters, they attempted to arouse him but were unsuccessful until they resorted to physical force. What transpired subsequently is best described by their own testimony:

"Q. Why did you go the room of Insani?
"A. [Sergeant Mutchler] Because Burney was going to point the man out that was in the room.
"Q. Did Burney point out Insani?
"A. Yes, sir.
"Q. What was Insani doing at the time you first saw him?
"A. He was in bed.
"Q. Sleeping?

522

"A. Yes, sir. I think so. I tried to wake him up.

"Q. Were you successful?

"A. No, sir.

"Q. How hard did you try?

"A. Well, I tried hard enough.

"Q. Did you try shaking him?

"A. Yes, sir, I did.

"Q. Then what action did you take in order to wake Insani?

"A. I didn't take any action. As I said before there was two military police there. They were fastworking people. They were young boys. He was on his feet before I knew what was going on.

"Q. How did they put him on his feet?

"A. Lifted him on his feet.

"Q. Is it true that one got on one arm and one got on the other arm and lifted him up forcibly?

"A. Yes, sir.

"Q. At that time did you read him Article 31, Uniform Code of Military Justice?

"A. *I did not because he was in no condition.*

"Q. What do you mean?

"A. *At that time I don't think he would have understood it.*

"Q. Why do you say that?

"A. Because he didn't act normal.

"Q. What was abnormal or subnormal about him at that time?

"A. He acted like he was—well, under the influence.

"Q. You were of the opinion that he was under the influence of alcohol so you did not read Article 31, Uniform Code of Military Justice to him.

"A. Yes, sir.

* * * * *

"Q. When you got him on his feet, did he appear to stagger?

"A. Yes.

"Q. Would you say he was too drunk to drive an automobile?

"A. I wouldn't say he was drunk. I wouldn't—I would say I wouldn't want to see him drive one.

"Q. You thought he was too drunk to read him Article 31, Uniform Code of Military Justice.

"A. Yes, sir, I did at that time.

"Q. Then you asked him to open his wall locker, is that correct?

"A. If he'd please open his wall locker.

"Q. Did you ask him if he would please open his wall locker? Were you that polite to him?

"A. Yes, I was. I am polite to everybody.

* * * * *

"Q. When he got up and you had him awake on his feet, did his movements to you indicate that he was a normally sober person?

* * * * *

"A. [Private First Class Riess] Well, sir, I can't actually say that he got up and—he could have been just tired or otherwise to me he was sober.

"Q. He was sober?

"A. Yes, sir.

"Q. What do you mean by his actions as they might refer to tired?

"A. Well, he had his eyes closed and he kept pushing the other MP away and *I had to grab him to keep him from swinging on the other MP and after that he quieted down and he was awake.*

"Q. Did you have to pull Insani out of bed?

"A. Yes, sir.

"Q. Did you have to yell to him to wake him up?

"A. Yes, sir.

* * * * *

"Q. *Did you tell him he didn't have to open his wall locker?*

"A. *No, sir, I didn't say anything like that.*

* * * * *

"Q. When he got out of bed you all are talking to him and you asked him to open his wall locker. And he went for his wall locker, were they the actions of a—were they smooth, coordinated actions or were they uncoordinated because he was tired and sleepy?

"A. [Private First Class Nemac] Well, sir, we didn't ask him to open his wall locker. We requested that he open it. *He didn't seem like he wanted to open his wall locker, sir.*

"Q. Do you think he didn't. Why didn't you think he seemed like he wanted to open his wall locker?

"A. Well, sir, *I just—by his actions and that I don't think he wanted to open his wall locker.*

. . . . .

"Q. You said he didn't want to open his wall locker.

"A. Well, sir, by what I mean he didn't want to open his wall locker—in one instance there in the billets when PFC Riess told him that his keys were in his shoe, well, he had his keys in his hands then all of a sudden his keys disappeared again. PFC Riess pulled the covers of his bed down and discovered the keys again and at that time Insani opened the wall locker.

. . . . .

"Q. *You said Insani seemed a little bit reluctant, is that correct?*

"A. *Yes, sir.*

"Q. Suppose you told Insani he didn't have to open that locker. Do you think he would have opened it?

"A. Sir, we didn't ask Insani to open his wall locker. We requested it.

"Q. What is the difference between ask and request?

"A. If you ask a man to do something that's just about like telling him to do it. If you request him to do something that's of his own free will." [Emphasis supplied.]

It is basic to our law that a search made with the freely granted consent of an accused person is lawful and its fruits admissible in evidence. United States v Wilcher, 4 USCMA 215, 15 CMR 215; United States v Berry, 6 USCMA 609, 20 CMR 325. It is an equally sound proposition, however, that mere peaceful acquiescence in the desires of law enforcement personnel does not amount to consent to search. United States v Berry, supra; Johnson v United States, 333 US 10, 68 S Ct 367, 92 L ed 436; United States v Cook, 1 CMR 850. The burden is on the Government to establish this predicate. United States v Sessions, 10 USCMA 383, 27 CMR 457; United States v Brown, 10 USCMA 498, 28 CMR 64. Nevertheless, we do not reverse unless the record offers no reasonable basis for the law officer's conclusion that the

search was consensual. United States v Alaniz, 9 USCMA 533, 26 CMR 313.

Consent to search has not been lightly implied in either the Federal or military systems. Thus, in Amos v United States, 255 US 313, 41 S Ct 266, 65 L ed 654, a wife's grant of permission to non-violent entry by Federal prohibition agents was held to result from coercion implied by their very presence on her threshold and deemed to amount to no more than mere acquiescence. In Catalanotte v United States, 208 F 2d 264 (CA 6th Cir) (1953), the defendant, informed by officers that he was suspected of narcotics violations, stated to them, " 'The house is yours. You won't find any narcotics here.' " The declaration was held not to amount to consent to conduct a search. And in United States v Alberti, 120 F Supp 171 (SD NY) (1954), wherein the defendant's reply to a request for permission to search consisted of the statement, " 'No, go ahead. The place is yours,' " it was concluded he did no more than indicate his resignation to the inevitable.

In United States v Heck, 6 CMR 223, military police informed a warrant officer their mission was to search the apartment jointly occupied by him and the accused. He replied, "Yes," and stepped aside. The board of review found the response implied no more than peaceful submission to officers of the law. Similarly, in United States v Guest, 11 CMR 758, the accused offered no objection to the search of his locker. Acquiescence rather than consent was found.

Viewed in the light of the foregoing precedents, the admitted facts in this record inevitably dictate the conclusion that, as a matter of law, there was no basis for finding the accused consented to the search in question. Forcibly removed from his bed in either a fatigued or intoxicated state, the accused was repeatedly requested by armed officers of the law to open his locker. Although one deemed him incapable of understanding his rights under Article 31, Code, supra, and another noted his obvious reluctance to comply with their "request," the policemen persisted in their course. Surely, it must have been obvious to this accused that resistance

to their demands would be futile, and the repeated assertion that he acted voluntarily is ridiculous. That the lawlessness of their actions may have become apparent to even the officers themselves is indicated by their discontinuance of the quest and contact of the accused's commander to conduct a further search. Certainly, if they believed accused to have consented, there was no reason for them to cease operations upon discovery of his possession of incriminating cigarettes.

Under the circumstances, there was little that the accused could do except bow to the force arrayed against him, and I would hold that his compliance with the "request" amounted to no more than peaceful submission to the inevitable. By according a greater dignity to his failure actively to protest, police methods are impliedly approved which smack of those commonly employed in totalitarian states and whose use I deem far more subversive of basic freedoms than permitting this accused to escape the consequences of his allegedly criminal behaviour. Cf. Johnson v United States, supra.

I would reverse the decision of the board of review and authorize a rehearing or dismissal of the charge.